**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

| | | |
|---|---|---|
| SHIRLEY BLACK, RENA MCCRAW, | ) | |
| And REBECCA MORRIS, Each | ) | |
| Individually and on Behalf of All Others | ) | |
| Similarly Situated | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Case No. 4:18-cv-778-KGB** |
| | ) | |
| DRIVELINE RETAIL | ) | |
| MERCHANDISING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to this Court's Third Amended Final Scheduling Order [Dkt. No. 43], dated August 26, 2021, Defendant Driveline Retail Merchandising, Inc. ("Driveline"), by and through its attorneys, Phillips Murrah, P.C. and Wright, Lindsey & Jennings LLP, hereby submits the following proposed findings of fact and conclusions of law in advance of trial:

## PROPOSED FINDINGS OF FACT

1. Driveline provides merchandising services to national and regional retail chains covering more than 80,000 stores across the country. Driveline provides these services—which vary from customer to customer and, for each customer, from project to project—through retail "merchandisers."

2. Plaintiffs Shirley Black, Derek Ward, Rena McCraw, and Rebecca Morris each worked as a merchandiser for Driveline for various periods of time.

3. Plaintiffs Black, McCraw and Morris initially filed a proposed nationwide collective action against Driveline, alleging that Driveline violated the Fair Labor Standards Act ("FLSA"),

1

29 U.S.C. § 201, *et seq.*, and Arkansas Minimum Wage Act ("AMWA"), Ark. Code Ann. § 11-4-201, *et seq.*

4.   On January 14, 2019, Derek Ward filed a Consent to Join Collective Action.

5.   Plaintiffs' Complaint--and their motion for conditional certification of a nationwide class of more than 13,000 Driveline merchandisers--alleged that Driveline had a practice of not paying Plaintiffs and other similarly-situated employees a lawful minimum wage for all hours worked up to 40 in one week or one and one-half times their regular rate for all hours worked in excess of 40 hours per workweek.

6.   On September 25, 2019, this Court denied Plaintiffs' motion for conditional certification of a nationwide class or a class limited to those employees in the State of Arkansas, finding insufficient evidence to show that all members of the proposed collective were subject to a common policy or plan or otherwise suited for collective or class treatment

7.   The three original plaintiffs and Mr. Ward, who filed a consent to join the lawsuit, contend that they were not paid for all time:  (1) preparing for their daily job assignments, (2) traveling to their first job assignments, (3) traveling and mileage incurred driving between jobs (if two or more jobs are worked in the same day), (4) completing assignments that lasted longer than the allotted time at certain job assignments or went beyond the scope of the assignment, and (5) training new Driveline employees.

8.   Plaintiffs each were employed by Driveline both prior to filing this lawsuit and for various period of time after the lawsuit was filed.

9.   The evidence shows that none of the Plaintiffs maintained contemporaneous notes of any actual hours worked for which they allege they were not fully compensated.

10. The evidence shows that none of the Plaintiffs kept any contemporaneous records of specific administrative time, commute time or drive time for which they allege they were not fully compensated.

11. Each Plaintiff testified at their deposition that it would be "impossible" and "unreasonable" to provide reasonable estimates for any category of damages claimed in this lawsuit.

12. Driveline kept detailed records of Plaintiffs' pay throughout their employment, including specific records regarding compensation for all drive time between stores visited within a workday and compensable mileage for each pay period of his employment.

13. Driveline provided Plaintiffs regular wage statements through the Driveline portal on a bi-weekly basis throughout their employment with Driveline.

14. For the years 2017 and 2018, Mr. Ward testified in his deposition that he "looked at [his] paycheck every week and matched it against the portal and [he] felt like [he was] being paid for all the hours that [he was] working."

15. Neither Mr. Ward nor Ms. McCraw produced a single responsive document in this litigation to support their claims.

16. Mr. Ward testified in his deposition that he "sent or showed [his counsel] the non bill emails" at some point during the lawsuit, but no such emails were ever produced to Driveline.

17. Mr. Ward testified in his December 15, 2021 deposition that from the time he was hired in 2017 until "the last few months of 2019," he believes he was properly paid by Driveline "from the time that [he] woke up in the morning and left for work till when [he] got home from work."

18. Mr. Ward further testified that before the last few months of 2019, whenever he had any concerns about the amount on his wage statements, he would address it with his supervisor and she would satisfactorily resolve each matter, to the best of his knowledge.

3

19. When asked at his deposition by Driveline's counsel to review his "Answers and Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents," Mr. Ward repeatedly testified multiple times that he had "never seen this document before."

20. Mr. Ward's verification page that was attached to his Answers and Responses to Defendant's First Set of Interrogatories declares to this Court, under penalty of perjury, "that the factual information contained in the foregoing Answers to Defendant's First Set of Interrogatories is true and correct to the best of my knowledge, information and belief."

21. Mr. Ward's sworn deposition testimony contradicted certain sworn statements in his Interrogatories that he signed under penalty of perjury.

22. At their deposition, when presented with a damages spreadsheet that was produced to Driveline as their initial damages disclosures, produced in July 2021, each Plaintiff testified that they had no knowledge of the document and had never seen the document before the deposition.

23. None of the Plaintiffs participated in creating or verified the accuracy of the "damages disclosures" before its production at various times during the discovery period by Plaintiffs' counsel.

24. As to unspecified hours that Mr. Ward alleges that he was not paid in the "last few months of 2019," Mr. Ward testified in his deposition that he could not recall any store names, specific projects, dates or the number of non-bills that he believes he was not paid for.  He further testified that it was "not even reasonable to give an estimate."

25. During all relevant times hereto, Plaintiffs were paid a flat hourly rate for each hour worked for Driveline, the rate depending on whether they were driving between stores or working at a client location.

26. Driveline does not have a policy to pay Plaintiffs additional bonus rates for training new employees.

27. Mr. Ward testified in his deposition that he was regularly and properly compensated for his time spent training new employees.

28. Mr. Ward testified in his deposition that he: (1) had no specific memories of the individuals he believed he trained or the dates on which he may have trained the individuals, (2) made no contemporaneous records regarding the dates or identity of any individuals he allegedly trained,  (3) had not reviewed any Driveline records regarding any allegedly-uncompensated time spent training such individuals and (4) had not seen or reviewed his own damages calculation alleging specific uncompensated training hours at any point prior to the deposition.

29. Mr. Ward testified in his deposition that he was unable to make even a "wild speculation" as to an estimate of the drive time between stores or to his first store over a month or a week.

30. Mr. Ward testified in his deposition that he had never calculated any uncompensated time or has any ability to calculate his morning prep time.

31. Mr. Ward's damages calculations, both the original calculation produced by Mr. Ward prior to his deposition and the calculation produced two months after his deposition, acknowledge and confirm that Mr. Ward was regularly compensated for "drive time hours" on each wage statement throughout his employment by including payments for those specific amounts for each pay period.

32. Plaintiffs' wage statements clearly show columns for "regular" time, "drivetime," and "overtime," as well as specific reimbursement for "miles."

33. At their deposition, when presented with a damages spreadsheet that was produced to Driveline as their initial disclosures, each Plaintiff testified that they had no knowledge of the

document, had never seen the document before the deposition, and could not speak with any degree of certainty as to why any information was included on the spreadsheet.

34. Plaintiffs elected not to retain an expert witness to testify as to damages in this case. Instead, Plaintiffs identified themselves as the individuals with the most knowledge about the hours they each worked for Driveline in Plaintiffs' initial disclosures.

35. When Mr. Ward was asked in his deposition about the damages calculations contained in his supplemental disclosures, he decisively contradicted the estimates included in his disclosures and stated the calculations in his disclosures were unreasonable.

36. The evidence shows that Plaintiffs' recollection as to their hours worked across their entire career at Driveline were highly contradictory.

37. Plaintiffs have testified at their depositions that they had not reviewed any of Driveline's records prior to their counsel's creation of their damages disclosures.

38. On Mr. Ward's damages calculation sheet, included in both his supplemental disclosures and second supplemental disclosures, he claims that over the course of his employment, he worked (during various two-week periods in which he claims to have worked 10 days per pay period): 175.59 hours, 145.80 hours, 157.49 hours, 180.54 hours, 237.52 hours, 205.35 hours, 273.52 hours, 209.43 hours, 140.38 hours, 147.58 hours, 211.49 hours, 207.81 hours, 167.56 hours.

39. Ms. Black's damages calculation sheet, produced to Driveline's counsel on the final day of the discovery period, asserts in several instances that she worked greater than 24 hours a day on average for each day worked for over a six-week period.  Thus, for many weeks of her employment—Ms. Black claims that she had actually worked, *on average,* 26.3 hours per day worked, 30.5 hours per day worked, and 24.8 hours per day worked.

40. Ms. McCraw testified in her deposition that she purposefully deleted and/or destroyed all paper files, emails and text messages regarding her employment with Driveline after she met with Plaintiffs' counsel and prepared to file suit against Driveline.

41. Mr. Ward further testified in his deposition that he:  (a) kept a "little notebook" of the alleged "discrepancies" that he noticed in his pay in 2019, (b) showed his calculations in the notebook to his counsel when he retained Sanford law firm, and (c) was fully aware that "as part of…bringing this lawsuit that [he] was required to produce all notes and records and anything related to any of [his] claims in this case."   Despite such testimony, Mr. Ward failed to produce this "little notebook" or any other documents responsive to Driveline's discovery requests at any point during the discovery period in this case.

42. Mr. Ward testified in his deposition that his supervisor Lisa Adair was responsive to any concerns that he raised regarding his pay and the hours he believed he had worked, and "[s]he would always tell [him] she turned it in and she would talk to whoever was about her about it."

43. Each Plaintiff repeatedly contradicted the "estimations" that form the basis of every damages calculation in this case—each testifying in their deposition that any attempt to reasonably estimate or even produce a "rough estimate" of the number of hours spent on all the allegedly-uncompensated tasks that form the basis for their damages would be "impossible," as no two days or weeks were sufficiently similar to make reasonable estimates for each day/week of their employment with Driveline.

44. When repeatedly given the opportunity to identify which projects, tasks, or dates for which they did not receive proper payment in their depositions, Plaintiffs could not identify any specific projects, dates or any pay periods for which they were not properly compensated, in alignment with their damages models.

45. In their depositions, Plaintiffs could not specify which pay periods had discrepancies, nor could they identify what the correct pay should have been if their allegations were true.

46. Plaintiffs each admitted they had not reviewed any of the over 11,000 documents produced by Driveline in response to Plaintiffs' discovery requests in preparing their damages calculations or made any attempt over the three-year discovery period to precisely identify specific jobs for which they believe they were not properly compensated.

47. While continuing to work for Driveline for some or all of the three-year discovery period, Plaintiffs did not create or produce any contemporaneous notes or records documenting their actual total hours worked for a single day, week, month or year, despite being represented by counsel at all times since the lawsuit was filed. Driveline's payroll records are the only records available in this case.

48. When Ms. Morris was presented with her purported damages calculations, she testified under oath that she had not participated in or assisted her counsel in any way in creating that document, and could not describe any aspect of the calculation, testifying that she did not "know how they came up with those figures."

49. Ms. Morris testified in her deposition that she never told "anyone at Driveline that [she] believed [she] wasn't being compensated for that [morning preparation] time."

50. When Ms. Morris was hired by Driveline, she was trained by another employee, and they split the hours they were allotted for projects. If a job ever took longer than the minutes allotted by Driveline, Ms. Morris would notify her manager and get prior approval for additional time to finish. Ms. Morris never had a problem with Driveline's system of confirming her hours worked. Ms. Morris testified at her deposition that she believed she was correctly paid for the time that she trained another employee and she was "not sure where [her counsel] got their calculation from"

when presented with her own damages disclosure spreadsheet that purported to show "eight hours of unpaid training hours."

51. Ms. Morris testified in her deposition that from the time she was hired in 2017 until the date of her deposition, she did not identify any discrepancies in her wage statements, other than the two emails she produced in this litigation.

52. The damages calculation produced by Plaintiff's counsel as Ms. Morris' damages disclosures contradict her own testimony.   The row for the pay periods encompassing the two dates for which Ms. Morris claimed in her deposition she was not paid do not contain "5 hours" (300 minutes) or "2.5 hours" (150 minutes), as Ms. Morris repeatedly testified in her deposition. Instead, Plaintiff's damages spreadsheet incomprehensibly alleges over 37 hours of uncompensated project time randomly attributed to various pay periods, which Ms. Morris disclaimed any personal knowledge of in her deposition.

53. Ms. Black testified in her deposition that she never reviewed the extensive project-specific records produced by Driveline to determine "what she was supposed to be paid versus what was actually paid."

54. Ms. Black testified in her deposition that she believed she had responsive text messages on her cell phone but that she had not searched for such responsive test messages related to her damages claims related to unpaid training hours because she "wasn't aware that [she] needed to." She claimed she "didn't feel it was necessary" to conduct such a review before her counsel created the unsworn damages calculation spreadsheet that she admittedly did not review or even see before they were submitted to Driveline as her damages disclosure.

55. Plaintiffs were well aware of the established procedure to address claims that they had worked more hours than allotted.  If Plaintiffs believed the hours reflected on their bi-weekly wage

statement contained discrepancies, they were able to send an email or text message to their supervisor, Lisa Adair, or submit an inquiry to Driveline payroll in order to resolve the issue.

56. With respect to the small number of emails produced by Ms. Black allegedly showing that she was not properly compensated, Ms. Black testified that Driveline sometimes added time for a "non bill" to a different project unrelated to that "non bill."  Ms. Black acknowledged that "she actually didn't care how they listed it as long as [she] got paid for it."

57. Ms. Black testified at her deposition that she never went through any of the project-by-project time and payment records produced by Driveline in response to her discovery requests to determine whether she was actually paid in full for all non-bill work that she initially raised with Driveline as potentially being unpaid as of the date of correspondence.

58. The evidence shows that Driveline merchandisers generally receive notice of possible jobs through the Driveline intranet. Based on where a merchandiser lives, Driveline sends electronic notice of available projects to the merchandiser, who can then accept or decline individual projects.  The notice includes details about the project (*i.e.*, the product, the work involved, *etc.*), where the store is located, and how much time Driveline has allotted for completion of the project, including any drive time and administrative time necessary to complete the project (*i.e.*, printing store diagrams, instructions).

59. If a merchandiser accepts an available project, he or she will ordinarily receive the project assignment days and even weeks before the project must be completed.

60. Upon acceptance, depending on the project, a merchandiser may need to print information including work orders and instructions. Any information to be printed, as well as the time necessary to print it, varies depending on the project.  The process of printing of any documents for a project can be performed at any time after the merchandiser accepts the project. Moreover,

the merchandiser can log on to any computer, electronic tablet, or their cell phones to access the Driveline intranet.

61. The merchandiser may need to take merchandise or promotional materials to the store for use on a particular project. Merchandisers receive any necessary merchandise or promotional material to take to stores at least the day before the project must be completed.

62. The merchandiser may load his or her vehicle with any necessary material or equipment at any time prior to going to the store.  Driveline does not require merchandisers to either log on the Driveline intranet to print these documents, or to load any items in their vehicles, on the morning a project must be completed.

63. After the merchandiser completes a project, he or she is required to confirm completion of the project through the Driveline intranet. As part of this process, the merchandiser is required to submit the time he or she took to complete the project, including any time spent on administrative tasks such as logging onto the Driveline intranet, printing off work orders and store diagrams, and reporting completion of the project, *etc*. This process can also be completed either on any computer, electronic tablet, or on the merchandiser's cellphone prior to leaving the store.

64. Ms. Black testified in her December 2021 deposition that for roughly two years since she started her employment with Driveline, she "had no problems with [her] paychecks. She repeatedly testified in her deposition that "it was late '18 when the discrepancies started."

65. On December 23, 2019, after she had filed this lawsuit and had been represented by counsel for 14 months in this case, Ms. Black wrote an email to the Driveline HR department, copying the owner and the CFO of Driveline, stating that she "had not been paid correctly for a series of non-bill projects...." Lori Bennett, the CFO of Driveline, contacted Ms. Black the same day she wrote the letter, confirmed that she had not been paid for non-bill projects in her letter, and she paid Ms. Black for all projects she could verify the same day that Ms. Black sent the letter.

11

66. In January 2020, Ms. Black and Driveline corresponded regarding the remaining jobs and mileage for which she did not believe she had been properly compensated.  In her correspondence, Ms. Black alleged that she was still owed 14.64 hours of unpaid time, plus drive time and mileage, as well as a $150.00 "Wendy's bonus," for a total of $311.63 plus drive time and mileage.  Driveline promptly investigated and paid Ms. Black for all the time that she claimed she was owed, except the "Wendy's bonus," which Ms. Black is not claiming as damages in this lawsuit.

67. After Driveline paid Ms. Black in January 2019 for all time that she claimed to be owed through January 2019 (other than the Wendy's bonus that Driveline determined was not owed to Ms. Black), Ms. Black never contacted Driveline's CFO again to advise her that she was not being compensated correctly, despite Ms. Bennett's email to Ms. Black stating "please don't hesitate to reach out again if you have issues regarding your pay."  Ms. Black's paystubs stated, "If there is any questions regarding your paystubs please contact your payroll administrator."  Ms. Black testified in her deposition that the only two times she contacted Driveline to advise Driveline that her payroll was incorrect was in the summer of 2018 and Christmas 2019.

68. When asked in her deposition if she could provide a "rough estimate of how many total hours" she believed she had worked for Driveline without proper compensation, Ms. McCraw testified that she did not know, "probably 40 or 50 hours, but I can't tell you that that's accurate," as it is "just speculation at this point."

69. Ms. McCraw testified in her deposition that she made some "mental notes" of some allegedly-unpaid time at some point during her employment, but "once [she] got this lupus brain fog it is hard to remember," as she has had "significant memory troubles" since "the last part of 2020."

70. Ms. McCraw testified in her deposition that when she reviewed her pay stubs and the drive time mileage paid on each pay stub, she never did any kind of comparison between the mileage that she was paid for and the miles she logged on her car and she could not identify any specific payrolls or specific jobs that she was not paid the correct mileage for that day or that specific job because "it's been too long" and she had not "done any of that kind of analysis in preparing for this case."

71. When asked about the damages disclosure spreadsheet that she had not previously seen before her deposition, Ms. McCraw wholly disclaimed her counsel's assumptions, testifying that she believed it was more correct that an estimate of around 45 minutes would encompass all the time from the moment she left her house to drive to the first store, all the time driving between the stores, and all the time she was in the car until she finished work for the day.

72. When asked in her deposition to provide "a list of the jobs that [she] believe[s] that as of the time that [she] resigned that [she] still had not been paid for, Ms. McCraw testified that the only uncompensated time as of the date of her resignation was "the training of people."

73. Ms. McCraw testified that she is not aware of any Driveline policy to pay her additional money or additional time for hours spent training other Driveline employees or any other Driveline policy that promised a higher hourly wage when she was training a new employee versus when she wasn't training a new employee.

74. Ms. McCraw testified in her deposition that when she reviewed her pay stubs and the drive time mileage paid on each pay stub, she never did any kind of comparison between the mileage that she was paid for and the miles she logged on her car and she could not identify any specific payrolls or specific jobs that she was not paid the correct mileage for that day or that specific job because "it's been too long" and she had not "done any of that kind of analysis in preparing for this case."

75. Plaintiffs cannot show that Driveline had actual or constructive knowledge that they were allegedly working unpaid overtime.

*76.* Plaintiffs each signed Driveline's Terms of Work Acceptance before accepting any projects.

The Terms of Work Acceptance provides, in relevant part,:

5.  I agree to complete the work within the time allowed for the work, as specified above.  **I understand and agree that the time allowed for the work includes administrative time (e.g., preparation for routes, completion of work orders, submission of digital photographs, etc.) as well as store time ("Instore Time"). I further understand and agree that if additional time is needed to complete the work, such additional time must be pre-approved by my manager in writing.**

…

10. **I understand and agree that mileage and drive time ("drive time") I incur in completing the work will be calculated through the use of a route optimization powered by Google Maps/Map Quest/Other similar mapping services ("Route Optimization").**  I further understand and agree that Driveline will not pay drive time, or reimburse mileage, for normal commute from my home to the first store on a given day or from the last store to my home.  I further understand that if the route optimization on a given day shows that my home is located more than 30 miles from either the first store or the last store, I will be reimbursed for my mileage and paid for drive time incurred beyond the first 30 miles between my home and the first store or the last store, as applicable.  Any compensable mileage or drive time between my home and either the first or last store will be calculated by route optimization.

77. Plaintiffs testified in their depositions that they were well aware of how to report any time above what Driveline scheduled them to work.

78. If Plaintiffs believed the hours reflected on their bi-weekly wage statement contained discrepancies, they testified that they were able to send an email or text message to their supervisor, Lisa Adair, or submit an inquiry to Driveline payroll in order to resolve the issue.

79. The uncompensated time claimed by Plaintiffs was time allegedly spent working at their home, working in a third-party store, or commuting alone in their cars, away from other Driveline employees.

80. The evidence shows that Plaintiffs did not report specific instances of compensable unpaid drive time or unpaid work time to Driveline payroll or Driveline managers.

## CONCLUSIONS OF LAW

1. Employers are required to keep records of wages and hours. 29 U.S.C. § 211(c). A plaintiff who brings suit under the FLSA and/or AMWA for unpaid overtime compensation has the burden of proving that he performed work for which he was not properly compensated. *Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059 (8th Cir. 2014); *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 686-87, 66 S. Ct. 1187, 1192 (1946).

2. A successful plaintiff needs to produce admissible evidence regarding the amount and extent of work for any week worked, especially when there are claims that every week of employment involved excess hours. *Holaway,* 771 F.3d at 1059.

3. The FLSA and AMWA have similar provisions regarding minimum-wage and overtime compensation. *See Harris v. Express Courier Int'l, Inc.,* No. 5:16-CV-05033, 2018 WL 6038242, at *3 (W.D. Ark. Nov. 16, 2018) (noting that "[t]he AMWA's minimum-wage and overtime rules predicate recovery on a worker being classified as an 'employee'—and the AMWA's definition of 'employee' is exactly the same as the FLSA. *Compare* Ark. Code Ann. § 11-4-203(3) *to* 29 U.S.C. § 203(e)(1)").

4. In the case at hand, the evidence shows that Driveline maintained specific time records throughout Plaintiff's employment. In fact, Driveline's own records comprise the vast majority of the approximately 100 pages of documents that comprise the entirety of Plaintiffs' production of responsive documents in this case.

5. Driveline's wage statements clearly show columns of payments for "regular" time, "drivetime," and "overtime," as well as specific reimbursements for "miles."

6.  Thus, the more stringent evidentiary standard applies to Plaintiffs' burden of proof in specifically showing that they were not properly compensated for every hour of worked time claimed in this suit.  *Carmody v. Kan. City Bd. of Police Comm'rs,* 713 F.3d 401, 406 (8th Cir. 2013).

7.  Because Plaintiffs have not provided any "admissible evidence regarding the amount and extent of work for any week worked," Driveline is entitled to judgment on each of Plaintiffs' claims. *Holaway,* 771 F.3d at 1059.

8.  Even if an employer fails to maintain accurate time records, which Driveline denies, an employee is only relieved of proving the exact extent of uncompensated work—the employee must still provide admissible evidence sufficient to support a relaxed evidentiary standard.  *See Carmody v. Kan. City Bd. of Police Comm'rs,* 713 F.3d 401, 406 (8th Cir. 2013).

9.  In *Carmody v. Kansas City Bd. Of Police Com'rs,* 713 F.3d 401 (8th Cir. 2013), the Eighth Circuit Court of Appeals affirmed the judgment of the district court that the plaintiff police officers had not satisfied even the "relaxed" burden of proof available due to their employer's inadequate record keeping because, in part, the plaintiffs' interrogatory responses were vague in only describing certain payroll practices, but not identifying specific dates worked, specific hours worked, or actual money owed.  *Id.* at 406-407.  The court noted that the plaintiffs had initially stated in their interrogatory responses that they needed pay records from the defendant to formulate more accurate responses, but they never used the information produced by the defendant to disclose more precise damages calculations.  Similarly, the plaintiffs' deposition testimony described allegedly-unlawful flextime practices, but did not provide any evidence of actual damages regarding specific overtime hours that violated the FLSA.  *Id.*  The court ultimately ruled that the plaintiffs had "fail[ed] to identify any record evidence showing actual damages from unpaid work in excess of forty hours per week."  Id. at 407 ("Without record evidence of a single hour worked

over forty hours that did not receive overtime wages or flextime, the officers' unsupported estimations of the unpaid hours due are not enough").

10. In *Christian v. New Age Distributing, Inc.,* 2021 WL 1035666 (Mar. 17, 2021 E.D. Ark.), this Court examined the sufficiency of the claims that an employer had failed to pay plaintiff merchandisers overtime wages in violation of the FLSA and AMWA.  In that case, the plaintiff merchandisers repeatedly testified that "each Merchandiser, route, and day was unique." *Id.* at *2. The merchandiser plaintiffs submitted declarations that they "regularly work more than forty hours, even more than fifty hours per week." *Id.*

11. The *Christian* defendant employee wholly failed to keep time records for the plaintiff merchandisers, believing they were exempt employees.   In their depositions, the plaintiffs attempted to estimate general hours worked per week, but did "not have any personal records or notations to otherwise substantiate his recollection," nor could the plaintiff "point to any particular week that he knows with certainty he worked overtime but was not paid for the overtime work." *Id.* at *3.  The court noted that his "estimates are based purely on his memory." *Id.*  In analyzing the plaintiffs' claims under the "relaxed" burden, this Court affirmed:

> A plaintiff employee must provide a meaningful, consistent explanation of the hours the employee claims to have worked.  This explanation must include details which would allow a jury to determine that the plaintiff employee worked the claimed overtime.  Vague and unspecific testimony will not do.  A plaintiff employee should point to specific dates worked, specific hours worked, or money owed.  Unsupported estimations of the unpaid hours due are not enough.

*Id.* at *9.

12. This Court noted in *Christian* that that the plaintiffs' "rough estimates of ranges of hours he remembers working are substandard given Plaintiffs' assertion that each…day was unique.  His daily descriptions rarely identify any of the specific stores that he visited on each "unique" route. And [the plaintiff] struggled to even recount all of the towns that he visited on each particular day." *Id.* at *10.  Based on this analysis, this Court held that the plaintiffs "did not identify details which

would allow a rational jury to determine that [the plaintiff] worked (without appropriate pay)" as to the claimed hours in question.  *Id.*

13. In *Zornes v. Thompson Transportation,* 2020 WL 6438252 (Nov. 2, 2020 E.D. Ark.), this Court noted that an FLSA plaintiff cannot satisfy their evidentiary burden by relying "mainly just on recollections of her daily activities," at least where those recollections are general and vague. *Id.* at *8.  This Court further noted that a plaintiff "must provide some specific information, such as specific dates worked, specific hours worked, or money owed."  *Id.*   In that case, the plaintiff's vague, general and contradictory testimony was insufficient to "reasonably determine the amount and the extent of her overtime work as a matter of just and reasonable inference."  *Id.* at *9.

14. Finally, in *Thompson v. DiMichele Enterprises, Inc.,* 2020 WL 1285040 at *9 (Jan. 3, 2020 E.D. Ark.)*,* this Court noted that *"Carmody* rejects reliance on vague testimonial statements and unsupported assertions to prove time worked" and further noted that the plaintiff in that case had "produced no documentary evidence or corroborating evidence of any kind to support his statements of memory."  *Id.*; *See Holaway v. Stratasys, Inc.,* 771 F.3d 1057, 1060 (8th Cir. 2014)*,* (noting that "vague testimony" and inconsistent or contradictory assertions fail even a relaxed standard of proof).  The *Thompson* court rejected the plaintiff's "recollection of arriving thirty minutes to one hour earlier on certain dates," due to the plaintiff being unable to show how he remembered his arrival time, aside from vague and conclusory statements of memory.  *Id. see Simmons v. Wal-Mart Assocs., Inc.,* S.D. Ohio No. 2:04-CV-51, 2005 WL 1684002 (July 19, 2005) at *27-30 (holding that an employee's evidence consisting of a "bald assertion that from 1999 to 2003 he worked off the clock over 200 times on unspecific days is not enough to create genuine issues of material fact as to whether he is owed any additional compensation"); *Holaway,* at 1060 (noting that "[t]his failure includes a failure by Holaway to check his hours worked against any business records kept by [the employer]").

18

15. Plaintiffs' conclusory and self-serving statements that Driveline's records are "not accurate" is not sufficient to permit Plaintiffs to rely on the relaxed standard of evidence. Regardless, even the relaxed standard is only met if an employee produces sufficient evidence to show the amount and extent of work "as a matter of just and reasonable inference." *Id.*

16. While the burden may be relaxed, it is not eliminated, and the employees must still prove the existence of damages. *Id.* at 407.  General allegations, couched in base assertions and vague testimony that fails to reference specific days and hours worked, fail to meet "even the relaxed evidentiary standards." *Id.* at 1059-1060.  The Eighth Circuit Court of Appeals has repeatedly held that general allegations couched in base assertions and vague testimony that fails to reference specific days and hours worked fails to meet even a relaxed evidentiary standard.  *Holaway v. Stratasys, Inc.,* 771 F.3d 1057, 1059-60 (8th Cir. 2014).

17. In *Thompson,* the plaintiff "failed to put forward any evidence of the amount and extent of his on-call work that exceeded 40 hours a week for any specific week he was on call," and instead he "provided contradictory and bare assertions of how he spent his on-call time and of his overtime hours worked while he was on call."  *Thompson v. Shock,* No. 4:13-cv-735-KGB, 2015 U.S. Dist. LEXIS 81902, at *39-40 (E.D. Ark. June 24, 2015). This Court held that such bare assertions, without presenting admissible evidence regarding specific weeks worked beyond 40 hours, failed to meet even the relaxed evidentiary standard. *Id.*

18. In *Meinke,* an FLSA plaintiff claimed that that his work hours were changed or not recorded, but he did not produce any admissible evidence regarding specific dates, supporting documents, or other corroborating information to support his assertions.  *Meinke v. S. Paramedic Servs.,* No. 4:15-cv-448-DPM, 2017 U.S. Dist. LEXIS 3336, at *3 (E.D. Ark. Jan. 10, 2017).  Judge Marshall likewise held for the employer, finding that the plaintiff's bare assertions were not sufficient evidence of unpaid time worked, and that the plaintiff's assertions alone could not support a jury's

finding that the plaintiff worked unpaid overtime in a given week. *Id.*; *see also Carlton v. JHook Invs., Inc.,* No. 4:17-CV-00076 KGB, 2019 WL 4784801, at *22–23 (E.D. Ark. Sept. 30, 2019) (citing multiple cases where Arkansas district courts and other district courts in the Eighth Circuit found that summary judgment was appropriate when plaintiffs offer only "bare assertions" of uncompensated time with no corroborating evidence to support their claims); *Dalton v. Hennepin Home Health Care, Inc.*, No. 15-cv-1566, 2016 WL 4402801, at *2 (D. Minn. Aug. 16, 2016) (noting that plaintiff's estimates were insufficient to meet the relaxed evidentiary standard because she had no documentation showing her hours for any specific week and because, when asked to identify a specific week when she worked more than 40 hours, she could not cite an example).

19. In *Middleton v. Hempstead Cty., Arkansas,* No. 4:18-CV-4112, 2021 WL 3179312, at *1–4 (W.D. Ark. July 27, 2021), the plaintiffs claimed that they were not adequately compensated for the overtime hours they worked. The Defendant in that case argued that it was entitled to summary judgment on this issue because Plaintiffs failed to put forth evidence sufficient to show the amount and extent of their work in excess of the amount they were compensated.  The court granted summary judgment for the employer, noting that

> Plaintiffs have submitted contradictory testimony and bare assertions regarding their overtime hours. They use vague terms, such as "sometimes" and "a lot of times," to describe the amount of overtime hours worked but not compensated for. … Maxwell estimated that in a two-week period he worked on average three to four overtime hours for which he was not compensated. Middleton recalled two instances in which he worked 75 overtime hours in a twenty-eight-day period but stated that he was paid for some of the overtime hours worked. He provided no other details regarding these instances. Plaintiffs provided these estimates without a meaningful explanation of how they arrived at these estimates.

*Id.* at *3.

20. The *Middleton* plaintiffs claimed that their timesheets were not accurate regarding the number of hours they actually worked. But the court noted multiple inconsistencies in the plaintiff's

testimony, including that "there is no evidence as to specific weeks that Plaintiffs worked overtime for which they were not compensated, and Plaintiffs do not have notes or other documents regarding their hours that they could compare to the business records kept by Defendant regarding their hours." *Id.* The court held that, "even taking the evidence in the light most favorable to Plaintiffs, the evidence is conclusory, inconsistent, not supported by specific facts, and insufficient to allow a jury to determine the amount and extent of alleged overtime work or to award damages." *Id.*

21. *Holaway* requires employees to provide concrete evidence of excess work when they claim they were improperly compensated for every week of employment, as Plaintiffs assert in this case. Otherwise, an employee's inability to identify any record evidence is fatal in the employee's attempt to meet--even a relaxed evidentiary burden.

22. Plaintiffs have only presented vague, highly-contradictory, and general estimates regarding how much uncompensated time they allegedly worked. Plaintiffs in this case present significantly less evidence than present in *Holaway* or *Carmody,* two cases where Plaintiffs were unable to meet even the relaxed evidentiary burden. Furthermore, while these two cited cases involved employers that did not keep accurate time records, in this case Driveline did keep and produce accurate time records and is therefore entitled to the more stringent evidentiary standard. However, even if using the improper relaxed standard to analyze Plaintiffs' claims, the speculative, unsworn spreadsheet produced by Plaintiff's counsel without the assistance of Plaintiffs is inconsistent with Plaintiffs' sworn testimony and provides no details that would allow a reasonable factfinder to determine the damages in this case. Therefore, Driveline is entitled to judgment in its favor on each of the Plaintiffs' damages claims.

23. Because Ms. McCraw, Mr. Ward and Ms. Black either purposefully destroyed all their Driveline records after speaking with counsel or willfully failed to review the records in their possession to produce such documents, these Plaintiffs should not be permitted to testify at trial as

to the potential existence of such destroyed or unproduced records in an attempt to bolster their wholly-unsupported claims.

*24.* Similarly, when Plaintiffs were presented at their December 2021 depositions with their purported damages calculations, they testified under oath that she had not participated in or assisted her counsel in any way in creating that document, and could not describe any aspect of the calculation, testifying that they did not "know how they came up with those figures." Even after being confronted with their highly-speculative, inconsistent damages estimates during their depositions, Plaintiff did not take advantage of the two months between their depositions and the discovery deadline to record or produce any contemporaneous records that would support the damages that they claim on their damages spreadsheets. Plaintiffs further testified in their depositions that they had never reviewed the extensive project-specific records produced by Driveline to determine "what she was supposed to be paid versus what was actually paid."

*25.* Each of the Plaintiffs engaged in impermissible document destruction and/or failed to disclose clearly-responsive documents that they claimed in their depositions to have had in their possession during the pendency of the litigation. Disclosure of such documents is mandatory under Fed. R. Civ. P. 26(a). Pursuant to Fed. R. Civ. P. 37(c), exclusion of all documents not disclosed under Rule 37(c)(1) from the evidentiary record is a "self-executing sanction." Plaintiffs should be prevented from attempting to bolster the validity of their claims by testifying as to the supposed substance of numerous emails and text messages to Driveline employees that they either destroyed or failed to produce throughout the three-year discovery period in this case.

*26.* In order to be liable under the FLSA, an employer must have actual or constructive knowledge that the employee has worked overtime. *Reich v. Stewart,* 121 F.3d 400, 407 (8th Cir. 1997).

*27.* An employee must be compensated if the employer "knows or has reason to believe" the employee worked at times that were not compensated. *Mumbower v. Callicott,* 526 F.2d 1183, 1188 (8th Cir. 1975).

*28.* "When the employee fails to follow reasonable time reporting procedures she prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA." *White v. Baptist Mem'l Health Care Corp.,* 699 F.3d 869, 876 (6th Cir. 2012).

*29.* Established procedures for overtime claims that employees regularly use can lighten the amount of inquiry required of an employer into potential overtime worked. *Hertz v. Woodbury Cry.,* 566 F.3d 775, 782 (8th Cir. 2009).

*30.* In order to prevail on their overtime and minimum wage claims, Plaintiffs are required to present evidence that they worked more than their scheduled hours without compensation and that Defendants knew or should have known that Plaintiffs were working unpaid overtime. *Hertz v. Woodbury Cty.,* 566 F.3d 775, 781 (8th Cir. 2009). There is no violation of the FLSA when an employer has no knowledge that an employee is engaging in overtime work and the employee fails to notify the employer of the overtime work. *Forrester v. Roth's I.G.A. Foodliner, Inc.,* 646 F.2d 413, 414 (9th Cir. 1981).

*31.* When an employee "fails to follow reasonable time reporting procedures [they] [prevent] the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA." *White v. Baptist Mem'l Health Care Corp.,* 699 F.3d 869, 876 (6th Cir. 2012).

*32.* Plaintiffs cannot prove that Driveline had actual or constructive knowledge that they were allegedly working unpaid overtime. The uncompensated time claimed by Plaintiffs was time

allegedly spent working at their homes, working in a third-party store, or commuting alone in their cars.

33. Driveline's policies, acknowledged by each Plaintiff before accepting each assignment, required Plaintiffs to report all compensable time worked on each assignment.  Plaintiffs were well aware of the established procedure to address claims that they had worked more hours than allotted. Because Plaintiffs were represented by counsel at all times while they allegedly sent such emails or text messages regarding uncompensated work and yet only one Plaintiff produced any emails to corroborate their testimony that they reported these alleged discrepancies to Driveline, Plaintiffs cannot establish that the followed Driveline's established reporting procedures, rendering the Driveline unable to compensate them appropriately, even if they were able to provide evidence of specific work that was uncompensated.  Pursuant to Fed. R. Civ. P. 37(c), exclusion of all documents not disclosed under Rule 37(c)(1) from the evidentiary record is a "self-executing sanction."

34. With respect to the small number of emails produced by Ms. Black allegedly showing that she was not properly compensated, Ms. Black testified that Driveline sometimes added time for a "non bill" to a different project unrelated to that "non bill."  Ms. Black acknowledged that "she actually didn't care how they listed it as long as [she] got paid for it."  As discussed above, Ms. Black testified that she never went through any of the project-by-project time and payment records produced by Driveline in this case to determine whether she was actually paid in full for all non-bill work that she initially raised with Driveline as potentially being unpaid as of the date of correspondence.

35. After the merchandiser completes a project, he or she is required to confirm completion of the project through the Driveline intranet. As part of this process, the merchandiser is required to submit the time he or she took to complete the project, including any time spent on administrative

tasks such as logging onto the Driveline intranet, printing off work orders and store diagrams, and reporting completion of the project.  This process can also be completed either on any computer, electronic tablet, or on the merchandiser's cellphone prior to leaving the store.

*36.* It is indisputable that Driveline did not have knowledge of Plaintiffs' specific claims of uncompensated working time, including preparation time and drive time to the first store and between stores.  Therefore, Driveline is entitled to judgment as to each of Plaintiffs' claims.

*37.* Under the Portal-to-Portal Act, employers are not liable under the FLSA for failing to compensate employees for:  (1) traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and (2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.  29 U.S.C. § 254(a); *IBP, Inc. v. Alvarez,* 546 U.S. 21, 27.

*38.* In *Rutti v. Lojack Corporation, Inc.,* 596 F.3d 1046 (9th Cir. 2010) the court noted that the plaintiff employee's morning activities of "receiving, mapping, and prioritizing jobs and routes for assignment" were directly related to his commute—not his principal activities for his employer.  Although the court noted that there were "some indications that [the plaintiff] also filled out some forms for his jobs at home, it is not clear that the paperwork could not be performed after [the plaintiff] reached the job site, or that [the employer] required the forms to be filled out before [the plaintiff] reached the job site." *Id*. at 1057.  The court found that these tasks, which allegedly took around ten minutes each morning, were not compensable under the FLSA. *Id.* at 1057-58.

*39.* In *Butler v. DirectSatUSA, LLC,* 55 F.Supp.3d 793, 807-08*,* the court held that time spent by a plaintiff employee reading emails regarding his next day's appointments, mapping out directions, and prioritizing his routes is not compensable under the FLSA.  Although the *Butler*

court could not determine from the record whether the employee's evening activities were properly classified as "*de minimus,*"   the court determined that the employee was not entitled to compensation for his commute time either to or from his work sites under the continuous workday doctrine because "the fact that [the plaintiff] is not required to make a transmission [after his last call] at any specific time means that he may use the intervening time for his own purposes, and accordingly, pursuant to 29 C.F.R. § 785.15, [the company] need not compensate him for the intervening time." *Id.*

*40.* In *Kuebel v. Black & Decker Inc.,* 643 F.3d 352, 360-61 (2d Cir. 2011), the Second Circuit Court of Appeals found that a retail specialist working in the field could not count his travel time as compensable because, even acknowledging that he performed required tasks at home, the record indicated that:

> It might have been necessary to perform certain activities in the morning, or in the evening.  It does not indicate that [the employee] was required to perform them immediately before leaving home, or immediately after returning home.  Indeed, there is nothing in the record to suggest that a Retail Specialist could not, for example, wake up early, check his email, synch his PDA, print a sales report, and then go to the gym, or take his kids to school, before driving to his first Home Depot store of the day.

*Butler v. DirectSat USA,* LLC, 55 F. Supp. 3d at 815 (citing *Kuebel,* 643 F.3d at 359-361); *see also Bettger v. Crossmark, Inc.,* No. 1:13-CV-2030, 2014 WL 2738536, at *6 (M.D.Pa. June 17, 2014)(noting that the plaintiff employee "has failed to present any evidence that [the company] required [the plaintiff] to check e-mail, load her car, or perform other administrative tasks *immediately* prior to driving to her first retail location (emphasis in original)).

41. As described above, Plaintiffs were all part-time employees who were free to choose how many assignments they selected each day to perform and the employees were able to perform those tasks in whatever order they desired at whatever times were most convenient for them, with the

freedom to take time for personal tasks throughout the day.  Thus, the "continuous workday" rule does not apply to the facts in this case.

42. As to the allegedly-uncompensated work performed some mornings by Plaintiffs before driving to their first job assignments, it is indisputable that the Terms of Work Acceptance executed by each plaintiff before accepting each job states that all administrative time is included in the total compensation calculated for that job. ("I understand and agree that the time allowed for the work includes administrative time (e.g., preparation for routes, completion of work orders, submission of digital photographs, etc.) as well as store time).  "It is well established that "if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process," because the employee has prevented the employer "from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA." *See Hertz v. Woodbury Cnty.,* 566 F.3d 775 (8th Cir.2009).

43.  All Plaintiffs in this case indicated that they were familiar with how to report alleged discrepancies in worked time while employed by Driveline.  Thus, judgment should be entered in favor of Driveline on each of Plaintiff's claims.

44. Under the "relaxed" burden of proof, if the plaintiff can "produce[] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference," the onus will shift to the employer to negate the reasonableness of the plaintiff's inference.  *Anderson,* 328 U.S. at 687-88.

45. Plaintiffs' trial brief states that Plaintiffs will seek damages under the FLSA and AMWA for five distinct categories of work that they allegedly performed for Driveline without receiving proper compensation: (1) morning preparatory work; (2) morning drivetime, (3) drivetime between stores, (4) non bills, and (5) training other employees.  Plaintiffs will allege that Plaintiffs' "best

27

recollections" of damages incurred in each category are sufficient to create a "just and reasonable inference" of the "amount and extent" of all allegedly-uncompensated work.

46. Plaintiffs claim in this lawsuit, without any supporting documentary evidence, that Driveline's payroll records "are both incomplete and inaccurate."  Despite being the only individuals in the world who have the ability to know how much time they allegedly spent performing the above categories of work, Plaintiffs instead submit damages disclosures based on "estimates" of various categories of damages throughout their employment, including for periods well after they filed this lawsuit and had a duty to preserve and produce all "documents and other evidentiary material…on which each computation is based, including materials bearing on the nature and extent of injuries suffered."  *See* Fed. R. Civ. P. 26(a)(1)(A)(iii).

47. Under Fed. R. Civ. P. 26(a)(1), each Plaintiff had a duty to, without awaiting any discovery requests, provide to the other party:  (1) a copy—or description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody or control and may use to support its claims or defenses and (2) a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying any documents or other evidentiary material on which each computation is based.

48. Under Rule 37(c)(1), "[a] party that ... fails to disclose information required by Rule 26(a) or 26(e) shall not be permitted to use [the materials not disclosed] at a trial, at a hearing, or on a motion," "unless such failure is harmless," or there was "substantial justification" for that failure. Fed. R. Civ. P. 37(c)(1). The sanction imposed by Rule 37(c)(1) is automatic "in the sense that there is no need for the opposing party to make a motion to compel disclosure . . . as a predicate for imposition of the sanction of exclusion." 8A Charles Alan Wright, *et al., Federal Practice and Procedure*, § 2289.1 at 704 (2d ed. 1994).

28

49. Federal Rule of Civil Procedure 26(a) requires litigants to make certain disclosures. *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698 (8th Cir. 2018).  The purpose of discovery is "to narrow the issues, to eliminate surprise, and to achieve substantial justice." *Greyhound Lines, Inc. v. Miller,* 402 F.2d 134, 143 (8th Cir. 1968).  "To this end, plaintiffs must make initial disclosures, including a computation of all types of damages, and must supplement their initial disclosures when they learn of new information."  *Middleton v. Hempstead County, Ark.,* 2020 WL 4927517 at *2  (Aug. 21, 2020 W.D. Ark).

50. The disclosure mandates of Rule 26 are given teeth by the threat of sanctions in Rule 37. *See* 8B Charles A. Wright, Arthur R. Miller *et al., Federal Practice & Procedure* § 2289.1 (3d ed. 2018).  Rule 37(c)(1) provides that when a party fails to comply with the disclosure requirements in Rule 26(a), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." The exclusion of evidence is a self-executing sanction for failure to make a disclosure required by Rule 26(a), without the need for a motion for sanctions. Vanderberg, *supra* at 702.

51. If a plaintiff "fails to timely disclose information contemplated by Rules 26(a) and (e), the Court "has wide discretion to fashion a remedy or sanction as appropriate for the particular circumstances of this case." *Id.* (citing *Wegener v. Johnson,* 527 F.3d 687, 692 (9th Cir. 2008).  The Court "may exclude the information or testimony as a self-executing sanction unless the party's failure to comply is substantially justified or harmless."  Fed. R. Civ. P. 37(c)(1); *Wegener,* 527 F.3d at 692; *Middleton,* 2020 WL 4927517 at *2.  When fashioning a remedy or sanction, the Court should consider "the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony."  *Middleton,* 2020 WL 4927517 at *2 (citing *Wegener,* 527 F.3d at 692).

52. Allowing a plaintiff "to offer evidence of damages after failing to timely disclose damages computations is prejudicial to Defendant.  The failure to timely disclose damages computations impedes Defendant's ability to place a reasonable estimated value on the case and creates the danger of trial by ambush." *Id.* at *3.  "[L]itigants should not indulge in gamesmanship with respect to the disclosure obligations" because those who so indulge "do their clients no service and necessarily risk the imposition of sanctions."  *Id.* at fn. 5 (citing *White Cap Constr. Supply, Inc v. Tighton Fastener & Supply Corp.,* 2010 WL 148430, at *2 (D. Neb. Jan. 12, 2010).

53. Plaintiffs failed to hire damages experts in this matter—they each admitted in their respective responses to Drivelines' Motions for Summary Judgment that they are acting as their own damages experts.  Plaintiffs submitted a bare-bones damages disclosures spreadsheets in July 2021, with no accompanying documentation, purporting to satisfy their obligations under Fed. R. Civ. P. 26(a)(1)(A)(iii).  Despite identifying themselves as their own damages "experts," each Plaintiff testified in their respective December 2021 depositions that they did not understand what their damages disclosure spreadsheets purported to disclose and that it would be "impossible" to provide any sort of "reasonable estimate" of their time spent performing any of the above activities on a daily or weekly basis.  Plaintiffs then produced identical damages disclosures on the final day of the discovery period in this litigation.

54. Plaintiffs' own "recollections" have changed multiple times throughout the three years since they filed their claims in this Court, causing their "recollections" to lack credibility and be so insufficient as to fail to meet their disclosure obligations under Fed. R. Civ. P. 26(a)(1)(A)(iii) and require exclusion pursuant to Fed. R. Civ. P. 37(c)(1), as well as being insufficient, regardless of exclusion, to satisfy even a "relaxed" burden of proof.

Respectfully submitted,


s/Lauren Barghols Hanna
KATHRYN D. TERRY, OKLAHOMA BAR #17151
LAUREN BARGHOLS HANNA, OBA #21594
PHILLIPS MURRAH P.C.
Corporate Tower / Thirteenth Floor
101 North Robinson
Oklahoma City, OK  73102
Telephone:   (405) 235-4100
Facsimile:    (405) 235-4133
kdterry@phillipsmurrah.com

lbhanna@phillipsmurrah.com


and

WILLIAM STUART JACKSON,
WRIGHT, LINDSEY & JENNINGS, LLP
200 West Capitol Avenue, Suite 2300
Little Rock, AR 72201
Telephone:     (501) 371-0808
Facsimile:      (501) 376-9442

wjackson@wlj.com

**Attorneys for Defendant,**
**Driveline Retail Merchandising Inc.**




CERTIFICATE OF SERVICE

I do hereby certify that true and correct copy of the foregoing Driveline Retail

Merchandising, Inc.'s Proposed Findings of Fact and Conclusions of Law has been emailed this

18th day of April 2022, to Judge Baker's chambers, with a copy to all counsel of record:

Josh Sanford
Colby Qualls
One Financial Center
10800 Financial Centre Pkwy, Suite 510
Little Rock, Arkansas 72211
Telephone: (800) 615-4946
Facsimile: (888) 787-2040
Josh@sanfordlawfirm.com

***Attorney for Plaintiffs***

/s/ Lauren Barghols Hanna
Lauren Barghols Hanna